```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                  SOUTHERN DISTRICT OF ALABAMA
                        SOUTHERN DIVISION
```

GABRIEL MADISON,              :

    Plaintiff,             :

v.                            :     CIVIL ACTION 04-00744-BH-B

CLAIRE SANBORN,               :

    Defendants.            :


**REPORT AND RECOMMENDATION**

Plaintiff, an Alabama prison inmate proceeding pro se, filed a Complaint under 42 U.S.C. § 1983. (Doc. 1). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendant's motion for summary judgment.(Doc. 21, 26). Upon careful review, the undersigned finds that this action is ripe for resolution, and that no evidentiary hearing is necessary as the record is fully developed. For the reasons stated below, the undersigned recommends that Defendant Claire Sanborn's motion be **GRANTED** and that Plaintiff's action against Defendant be dismissed with prejudice.

**I.   SUMMARY OF FACTUAL ALLEGATIONS**

From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation. Madison is serving a life sentence at Fountain Correctional Center on his conviction for murder. (Doc.

1).  On November 19, 2004, Madison filed a Complaint under 42 U.S.C. § 1983 against Defendants Claire Sanborn, Dr. McCane, Mr. Evans, and Susan McBride, claiming that these Defendants violated his rights, privileges, and immunities under the United States Constitution. (Doc. 1).

During his incarceration at Fountain, Madison was enrolled in the facility's Adult Education Program ("AEP").  Through an arrangement with the Jefferson Davis Community College ("JDCC"), which administers the AEP, Fountain offers its inmates adult education services and vocational training at a correctional educational facility located adjacent to the Fountain campus. Inmates are selected by Alabama prison officials to participate in the AEP; however, instructors have discretion to withdraw students whose conduct is determined to be unduly disruptive to the learning environment. (Doc. 21 at Ex. 1).

Madison initially enrolled in the AEP in 1999 and was assigned to JDCC instructor Ernest Marvin. (Id.)  Prior to the commencement of the Fall 2003 Semester, Mr. Marvin approached Defendant Sanborn and requested that Plaintiff Madison be placed in her class because he had been having difficulty with Madison for some time. According to Mr. Marvin, Madison took excessive bathroom breaks, was resistant to assistance from peer trainers, made outrageous and inflammatory comments in class, and spent time writing personal letters in class. (Doc. 21, Ex. 4).  Sanborn agreed; thus, Madison

was transferred to her class for the Fall 2003 semester.  Madison remained in Sanborn's class until the Fall 2004 Semester. (Doc. 21, Ex. 1.)

Immediately upon being assigned to Sanborn's class, Madison was made aware of and signed copies of both the Jefferson Davis Community College Code of Conduct for Adult Education, and the Rules for Sanborn's class. (Id.).  Notwithstanding his agreement to abide by the terms of these policies, Madison immediately proceeded to violate Sanborn's class rules. (Id.)  Sanborn decided, in mid-August 2004, that it would be best if she withdrew Plaintiff from her class. (Id.)

Madison filed various complaints about Sanborn over an unspecified period of time. (Doc. 1 at p.10).  On August 16, 2004, Madison authored a letter to Michael Evans, Director of JDCC Adult Education Program, wherein he described what he alleged to be Defendant Sanborn's abusive treatment of student-inmates generally, and Plaintiff in particular, while in Sanborn's class. (Doc. 21, Exs. 1, 5, 6).  On August 19, 2007, Dr. McCane visited Madison at the AEP facility and received an oral account of Madison's complaint against Ms. Sanborn. (Doc. 1; Doc. 21).  Madison also informed McCane that although he had written a complaint letter to Mr. Evans, he had not yet received a response from him. (Doc. 1).  At the close of her visit, McCane indicated that she would dispatch Mr. Evans to speak with Madison. (Id.).

Mr. Evans conducted a meeting with Sanborn and Madison on August 24, 2004, during which Mr. Evans read Madison's letter of complaint and solicited Sanborn's response to the issues raised. (Doc. 21, Ex. 6, ¶ 6). Sanborn responded to Madison's complaints and notified Mr. Evans that, prior to this meeting, she had already decided to remove Madison from her class. Mr. Evans convinced Sanborn to temporarily suspend her efforts to remove Madison from her class so that Mr. Evans could attempt to resolve the concerns expressed by Sanborn and Madison. (Doc. 21, Ex. 6, ¶ 7).

Madison contends that following the meeting, Sanborn started taunting him in front of the class. (Doc. 1) According to Sanborn, instead of improving, Madison's classroom conduct worsened following the meeting, as Madison became more argumentative and insubordinate. (Doc. 21, Ex. 1). On August 30, 2004, Defendant Sanborn forwarded a memorandum to Jerry Farrell, warden of Fountain Correctional Center, and Mr. Evans, requesting that Madison be removed from her class because of his disruptive behavior and lack of academic progress. (Doc. 21, Ex. 5, ¶ 16); (Doc. 21, Ex. 5, Attch. B). On August 31, 2004, Defendant Sanborn signed a withdrawal form officially removing Madison from her class. (See Doc. 21, Ex. 5, Attch. C). Madison was re-admitted into the AEP for the Spring Semester of 2005, but was later withdrawn from the program upon his transfer to the J.O. Davis Honor Camp. (Doc. 21 at Ex. 4).

**II.    PROCEDURAL HISTORY OF CASE**

Following the filing of Plaintiff Madison's complaint, it was screened pursuant to the requirements of 28 U.S.C. § 1915(e)(2)(B). Madison's claims against Defendants McCane, McBride, and Evans were dismissed with prejudice prior to service of process for failure to state a claim upon which relief could be granted. (Doc. 14). The remaining Defendant, Clair Sanborn, filed her answer and special report on March 21, 2006. (Docs. 21, 22). In her answer and special report, Sanborn asserts that she is entitled to judgment as a matter of law on Madison's claims because Madison's allegations do not establish a constitutional violation and further, that she is entitled to qualified immunity as a public official acting in her official capacity as an instructor for a state academic institution.[1] Sanborn also asserts that Madison did not engage in constitutionally protected speech by filing a letter of personal grievances, and that even if the letter were constitutionally protected, she was unaware of the letter at the time she made the

---

[1] "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  In determining whether qualified immunity is appropriate in a given case, "[t]he court must first ask the threshold question whether the facts alleged, taken in the light most favorable to the plaintiffs, show that the government official's conduct violated a constitutional right."  Dalrymple, 334 F.3d at 995 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Having found herein that Plaintiff's allegations do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.

5

decision to withdraw Madison from the AEP. (Doc. 21 at 18). Sanborn also argues that summary judgment is appropriate in this case as Madison has failed to allege any actionable damages arising from her decision to remove him from the AEP.

Defendant Sanborn also submitted, in support of her Special Report, an affidavit based on her personal knowledge, as well as affidavits executed by Mr. Evans and Mr. Marvin. (Doc. 21, Exs. 1, 4, 6). On February 26, 2007, Defendant's Special Report and Answer was converted into a Motion for Summary Judgment (Doc. 26). Plaintiff was given notice of the conversion, and of his right to a response. Furthermore, Plaintiff was advised of the requirements of Fed.R.Civ.P. 56 and of the ramifications of a motion for summary judgment. (Doc. 26). As of the date of this Report and Recommendation, Plaintiff has filed no response.[2]

### III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 (c) provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

---

[2] In this case, Madison did not respond after Defendant's Answer and Special Report were converted into a motion for summary judgment. Thus, the only material submitted by Madison that is competent evidence to support his claims is his complaint, which was signed under penalty of perjury. Because it was signed under penalty of perjury, it is being treated by the Court as an affidavit. Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980).

6

matter of law. Fed.R.Civ.P.56 (c). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." Id.; *accord*, Tipton v. Bergrohr GMBH-Siegen, 965 F. 2d 994, 998 (11th Cir. 1992), *cert. denied*, 507 U.S. 911, 113 S.Ct. 1259, 122 L. Ed. 2d 657 (1993). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. V. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986). Once the movant satisfies its initial burden under Rule 56(c), the plaintiff is required to produce some evidence to support his constitutional claims. He must "go beyond the pleadings and...designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. A plaintiff's mere verification of conclusory allegations is not sufficient to oppose a motion for summary judgment[3]. Harris v. Ostrout, 65 F. 3d 912, 916 (11th Cir. 1995). Consequently, when a party "fails to make a showing sufficient to establish the

---

[3] In this case, Miller did not respond after Defendants' Answers and Special Reports were converted into a motion for summary judgment. Thus, the only material submitted by Miller that is competent evidence to support his claims is his complaint, which was signed under penalty of perjury. Because it was signed under penalty of perjury, it is being treated by the Court as an affidavit. Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980).

7

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" summary judgment is due to be granted in favor of the moving party. Celotex, 477 U.S. at 322. Where all the materials before the court indicate that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. Id.; Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987).

Although factual inferences must be viewed in the light most favorable to the non-moving party, and pro se complaints are entitled to liberal interpretation by the courts, a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a material fact in order to avert summary judgment. Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990). The record in this case demonstrates that Madison has failed to establish that there is any genuine issue as to any material facts sufficient to avert judgment in favor of Defendant.

**IV. DISCUSSION**

In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir.2001). Section 1983 "requires proof of an affirmative causal connection between the

official's acts or omissions and the alleged constitutional deprivation." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir.1986).  A § 1983 claimant must allege facts in support of his claims with some specificity. Wilson v. Strong, 156 F.3d 1131, 1135 (11th Cir.1998).  A mere "scintilla" of evidence that supports the nonmoving party's position with respect to a motion for summary judgment is not sufficient. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997).  In this case, Madison alleges that Defendant Sanborn removed him from her AEP class in retaliation for his letter of complaint against her.  In particular, Madison contends that on August 24, 2004, Sanborn, upon learning that he had filed a complaint against her, taunted him in front of a classroom of students and later retaliated against him by dismissing him from the class.

Although Plaintiff has not termed his complaint as such, it appears that he is seeking to argue that he was retaliated against for exercising his First Amendment right to complain about the instruction being received at JDCC generally, and Defendant Sanborn in particular.  The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." Farrow v. West, 320 F.3d 1235, 1248 (11th Cir.2003).  To state a retaliation claim cognizable under § 1983, a prisoner must demonstrate that (i) he engaged in a constitutionally protected activity, (ii) he suffered adverse treatment simultaneously with or

9

subsequent to such activity, and (iii) a causal connection existed between the protected activity and the adverse action." Flynn v. Scott, 2006 WL 1236718, *5 (M.D.Ala.2006) (citing Donnellon v. Fruehauf Corp., 794 F.2d 598, 600-01 (11th Cir.1986); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir.2003)).

> "An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of the evidence, which once established raises a presumption that prison officials retaliated against the inmate.... Merely alleging the ultimate fact of retaliation, however, is insufficient.... Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to demonstration of a retaliation claim.... If an inmate establishes a prima facie case, the burden then shifts to prison officials to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the prison official retaliated against the inmate. This may be done by the prison official articulating a legitimate, non-retaliatory reason for the adverse decision or action, which is clear, reasonably specific and worthy of credence. The prison official has a burden of production, not of persuasion, and thus does not have to persuade a court that he or she actually was motivated by the reason advanced.... Once the prison official satisfies this burden of production, the inmate then has the burden of persuading the court by sufficient evidence that the proffered reason for the adverse decision is a pretext for retaliation."

Flynn, 2006 WL 1236718 at 5-6 (citations omitted). A prisoner "must allege facts showing that the allegedly retaliatory conduct would not have occurred but for the retaliatory motive." Hempstead v. Carter, 2006 WL 2092383, *5-6 (N.D.Fla.2006)(citing Jackson v. Fair, 846 F.2d 811, 820 (1st Cir.1988)). "[A] causal connection may

be alleged by a chronology of events that create a plausible inference of retaliation. Id. (citing Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)). However, "[t]he relevant showing ... must be more than the prisoner's 'personal belief that he is the victim of retaliation.' " Id. (citing Johnson v. Rodriquez, 110 F.3d 299, 310 (5th Cir.1997)).

Federal courts must 'carefully scrutinize retaliation claims' which challenge disciplinary action against prison inmates, as prisoners often attempt to 'inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them.'" Flynn, 2006 WL 1236718, (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995)). "Carefully scrutinizing such claims is [necessary because prisoners'] ... claims of retaliation are ... easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Id. "This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act.")." Id.

In assessing retaliation claims, appropriate deference should be afforded to prison officials "in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory ." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir.1995)

(citing Sandin v. Conner, 515 U.S. 472, 487, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995)).  And, because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury...." Crawford-El v. Britton, 523 U.S. 574, 598, 118 S.Ct. 1584, 1596-97, 140 L.Ed.2d 750 (1998) (internal quotation marks omitted). Indeed, while mindful that Plaintiff may not be held to a heightened burden of proof, see Crawford-El, 523 U.S. at 580-86 (holding that in retaliation claim, prisoner could not be required to show "clear and convincing" evidence of defendant's unconstitutional motives), courts should approach prisoner claims of retaliation "with skepticism and particular care" due to the "near inevitability" that prisoners will take exception with the decisions and actions of prison officials and "the ease with which claims of retaliation may be fabricated." Hempstead, 2006 WL 2092383, (citations omitted).

Assuming arguendo that Madison has carried his initial burden of presenting prima facie proof of retaliation, the undersigned finds that Sanborn has, in turn, met her burden of demonstrating that the adverse action about which Madison complains resulted from his history of poor academic performance and misconduct.  In the face of Defendant Sanborn's showing that Madison was dismissed from class due to his poor academic performance and disciplinary problems, Madison has offered no competent evidence to counter

12

Sanborn's showing and thereby create a genuine issue of material fact. The undisputed evidence establishes that Madison arived in Sanborn's class during the Fall Semester of 2003 due to the fact that Mr. Marvin, his previous instructor, was having difficulty with Madison, and requested that Sanborn take him on as a student with the hope that he would perform better in Sanborn's class. (Doc. 21, Ex. 4). Upon his placement in Sanborn's class, Madison was placed on notice of JDCC Code of Conduct for Adult Education, and the rules for Sanborn's class. (Doc. 21, Ex. 1). Notwithstanding, Madison proceeded to repeatedly disrupt classroom operations by violating conduct rules and arguing with Sanborn. Madison failed to study assigned lessons while in class, and chose instead to read books which were to be used when class was not in session. (Doc. 21, Ex. 1, ¶ 10). When Sanborn attempted to redirect Madison's attention to his classroom assignments, Madison would become argumentative and protest that he was given permission to read those books, even though Sanborn's classroom conduct policy explicitly prohibited the reading of extra-curricular materials during class time. (Doc. 21, Ex. 1, Attch. A).

Madison also took excessive numbers of restroom breaks. Sanborn's classroom policy allowed each student three emergency restroom breaks per semester, in addition to the regularly scheduled break periods each class day. (Id.). Madison, however, took approximately 66 restroom breaks over the course of his studies with Sanborn. (Doc. 21, Ex. 1, ¶10.). When denied

permission to use additional restroom breaks, Madison would argue with Sanborn that as a man, he could use the restroom whenever he so decided, or, in the alternative, complain that he required additional restroom breaks because he suffered from a stomach ailment. (Id.).  When Sanborn was requested to provide documentation of his medical condition, he refused to do so. (Id.).

Additionally, Madison also made minimal academic progress while in Sanborn's class.  During the Summer semester of 2004, Madison earned a composite score of 4.8 on a standardized test administered to all AEP participants to chart academic progress, with individual scores of 6.4, 2.6, and 5.7 in reading, language skills, and mathematics, respectively.[4] (Doc. 21, Ex. 1, ¶ 12).  A comparison of his performance on the same test administered at the beginning of his enrollment in the AEP in Fall 1999, on which he earned a composite score of 4.1, demonstrated that Madison had make relatively little academic progress while in Sanborn's class. Plus, Madison rejected the assistance of inmate GED graduates assigned to Sanborn's class to provide help with class work, and constantly disrupted the studies of students attempting to complete their assignments. (Doc. 21, Ex. 1, ¶ 11).

Moreover, as noted supra, Madison exhibited similar

---

[4]Prior to assignment within the AEP, each student-inmate is administered the Test of Adult Basic Education ("TABE"), and based on the TABE results, placed in a course of study appropriate to the student-inmate's academic abilities. Student-inmates are tested at regular intervals to measure their academic progress. (Doc. 21 at 5-6);(Doc. 21, Ex. 1, ¶ 6).

disciplinary problems during the four years in which he was a student in the classroom of AEP instructor Ernest Marvin. As in Sanborn's classroom, Madison requested excessive restroom breaks. (Doc. 21, Ex. 4, ¶ 5). Madison also voiced frequent complaints regarding Marvin's classroom procedures and often resisted completing required forms. (Doc. 21, Ex. 4, ¶ 4). Madison also failed to work on assigned lessons while in class, and routinely protested when instructed to put away extra-curricular reading materials in favor of assigned class work. Madison also frequently rejected academic assistance from inmate peer trainers, stating that they were not qualified to help him. (Doc. 21, Ex. 4, ¶ 6). Madison also disrupted classroom discussions with outrageous and inflammatory remarks. (Id.).

In the face of Defendant's showing, Plaintiff has come forth with no competent evidence from which it can be inferred that Defendant Sanborn did not act for legitimate reasons. Madison's conclusory allegations are insufficient to show that the legitimate reasons proffered by Sanborn are pretextual. Madison has not alleged, let alone demonstrated that he was in fact adhering to the class room rules and was making academic progress. Moreover, while Plaintiff contends that his complaints against Sanborn motivated her to dismiss him from her class, the undisputed evidence reflects that notwithstanding the August 24th meeting between Sanborn, Madison and Mr. Evans, Madison's class room behavior did not improve, but actually worsen. In the face of the undisputed record

15

evidence, the undersigned finds that Plaintiff has failed to proffer facts sufficient to create a genuine issue of material fact. It is abundantly clear that notwithstanding Madison's complaints, Defendant would have made the same decision given Madison's escalating disruptive behavior and lack of academic progress. Accordingly, Madison's retaliation claim fails as a matter of law.

## V. CONCLUSION

Based on the foregoing, it is recommended that Defendant Sanborn's motion for summary judgment (Doc. 21) be granted and that Plaintiff's action against Defendant be dismissed with prejudice.

The attached sheet contains important information regarding objections to this recommendation.

DONE this **19th** day of **September 2007**.

            /s/SONJA F. BIVINS
           **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1. **Objection**. Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(c); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.